## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MAYAGUEZ ECONOMIC DEVELOPMENT, INC.,** | |
| Plaintiff-Counter Defendant, | |
| v. | CIV. NO. 18-01692 (PG) |
| **TREVOR FEDERKIEWICZ,** | |
| **and** | |
| **KNOW LIMITS PRIVATE LENDING, INC.,** | |
| Defendants-Counterclaimants. | |

## OPINION AND ORDER

Before the court is Plaintiff's Motion for Summary Judgment (ECF No. 47) and Statement of Undisputed Facts (ECF No. 48), as well as Defendants' Counter Statement of Facts (ECF No. 54) and Response in Opposition (ECF No. 55). For the reasons below, the court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment and **DISMISSES** Defendants' counterclaim in the same case (ECF No. 14).

## I.     BACKGROUND

On September 19, 2018, Mayagüez Economic Development Inc. ("MEDI" or "Plaintiff") filed suit against Know Limits Private Lending, Inc. ("KLPL") and its president Trevor Federkiewicz ("Federkiewicz") for (1) tortious recovery because of embezzlement, and (2) specific contract performance. On January 28, 2019, KLPL and Federkiewicz ("Counterclaimants") filed an Answer to Complaint and Counterclaim (ECF No. 14).[1]

---

[1] This court has jurisdiction of this case pursuant to diversity jurisdiction principles. MEDI is a municipal corporation of the Municipality of Mayaguez, while KLPL is a Canadian money lending corporation. See Initial Complaint (ECF No. 1) at ¶ 3, and Counterclaim (ECF No. 14), at ¶ 3.

In short, MEDI claimed that Counterclaimants embezzled its money, which was transferred to them as deposit for the signing of a Letter of Intent ("LOI"). The LOI stated that KLPL would provide Plaintiff with a loan in order for it to purchase certain energy generators from a company named EcoGen Energy ("EcoGen")[2]. MEDI also claimed that Counterclaimants breached the LOI because they failed to return the full deposit when asked for, thus failing to uphold the specific performance of the LOI agreement.  Conversely, Counterclaimants argued that during the LOI's negotiations, MEDI committed fraud, unjust enrichment and *quantum meruit*, as well as negligent misrepresentation and breach of contract. They contended that MEDI was responsible for failing to comply with the LOI, reason for which the loan failed to close within the time frame required by the LOI.

In their respective complaints, MEDI petitioned for its deposit to be returned while Counterclaimants petitioned for damages in the amount of $1,181,200.00 dollars. All recoverable claims were brought forth under Puerto Rico's Civil Code.

## II.     STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This rule specifically allows for disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact […]." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000).  "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her

---

[2] EcoGen Energy is a manufacturer of energy generators in Puerto Rico. See ECF No. 47-11.

ability to show that such a dispute exists." <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir.2014) (*citing* <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir.2010)).

At this juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. <u>See</u> <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir.2002). The court need not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture or vitriolic invective." <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23 (1st Cir.2017) (*quoting* <u>Pina v. Children's Place</u>, 740 F.3d 785, 795 (1st Cir.2014). The court reviews the record "as a whole," and "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 135 (2000).

If the non-movant generates uncertainty as to the true state of a material fact, the movant's efforts are unavailing. <u>Suarez v. Pueblo Int'l</u>, 229 F.3d 49, 53 (1st Cir.2000). But the mere existence of an "alleged factual dispute [ ] will not affect an otherwise properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). <u>See</u> <u>Cherkaoui</u>, 877 F.3d at 23-24 (*quoting* <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir.1996)) ("[f]acts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and "a dispute is genuine 'if the evidence [ ] is such that a reasonable jury could resolve the point in favor of the non-moving party'").

### III.    FINDINGS OF FACT

Having the parties complied with Rule 56 by presenting their facts along responses and exhibits, the court will now outline its own undisputed set of facts. In doing so—and since the facts on record are mostly uncontested—the court will modify Plaintiff's statement of facts ("PSF") to incorporate Counterclaimants' counter statements of facts ("DCSF").

On May 1, 2018, MEDI and KLPL signed an LOI consisting in a loan proposal intended for the purchase of power generation units. Federkiewicz signed as President/CEO and authorized agent of KLPL, while Alejandro Riera ("Riera") signed as authorized agent and Executive Director for MEDI.[3] PSF ¶ 1. See LOI, ECF 47-1. Per the LOI, MEDI would deposit $1,375,000.00 in a Segregated Project Account Solely for the MEDI Project with a commitment that the deposit *would be returned in full if the loan did not close within 120 days*. MEDI wired the deposit amount to Federkiewicz on May 18, 2018. PSF ¶ 3. MEDI eventually requested the deposit back because no loan closed within the 120 days from the date of the signing of the LOI or the wiring of the funds, to which Counterclaimants refused and informed that the deposit was spent at least partly. PSF ¶¶ 2-4. The LOI stated for "[t]he deposit to be used solely as equity thru project draws." PSF ¶ 22. See ECF No. 47-1.

On May 4, 2018, leading to the wiring of the deposit, Jose Hernández Mayoral ("Hernández")[4], as the contact person for MEDI and Counterclaimants, emailed Federkiewicz saying: "[w]e should expect the transfer to occur early next week. [Riera] is aware that the process will not start running until that happens." PSF ¶ 5. See May 4, 2018 email, ECF No. 47-3. On May 5, 2018, Hernández informed Federkiewicz that he was "Com[ing] in as EcoGen's rep" but that MEDI had authorized him to talk on its behalf. See First May 5, 2018 email, ECF No. 47-4. In other words, Hernández was authorized by Riera to serve as the contact person for both parties. See Hernández' Affidavit, ECF No. 47-11, page

---

[3] Counterclaimants admitted the signing of the LOI but qualified this fact arguing that they (1) did not accept the letter in time; (2) did not waive acceptance terms; (3) did subsequent work and services not based on the LOI; and that (4) Federkiewicz signed the LOI merely as a representative for KLPL, not in his individual capacity. As we will see from the following discussion, the court only agrees with point number 4.

[4] As noted below, the next day Hernández told Federkiewicz he was a representative for EcoGen, the power unit manufacturer. Nonetheless, he mentioned that he was authorized by MEDI's Executive Director to speak on behalf of them with KLPL on this matter. See First May 5, 2018 email, ECF No. 47-4.

2. That day, Federkiewicz resplied: "[t]hanks for providing the detailed framework you are working under. It seems like Alejandro [Director for MEDI] and you have a real good idea on how to move things forward...". PSF ¶ 6. See Second May 5, 2018 email, ECF No. 47-4.

On May 11, 2018, Federkiewicz emailed Hernández stating: "I wanted to take a moment this Friday to see how progress has gone this week with Alejandro [Director for MEDI] and the work he was completing on the MEDI project. Do you have any update on his status moving forward?" PSF ¶ 7. See May 11, 2018 email, ECF No. 47-5. On May 11, 2018, Hernández responded: "I have been given assurances that the transfer will occur no later than next Friday the 18th. I will update you Monday until they do it. I am pushing so that it occurs sooner. But that is all I have right now." PSF ¶ 8. See Second May 11, 2018 email, ECF No. 47-6. On May 13, 2018, Federkiewicz followed up: "I am hopeful that we are getting closer, as we have allocated $15M to MEDI we are hopeful that we can get the deposit step completed so we can start the work for us to initiate the project and get the capital moving as soon as possible." PSF ¶ 9. See May 13, 2018 email, ECF No. 47-7.

On May 15, 2018, Hernández emailed Federkiewicz two times regarding the same matter. First, he said that he had talked to Riera and that the wiring of the deposit was on schedule for that Friday. Second, he asked Federkiewicz "[w]hat kind of information would you need from this end?". PSF ¶¶ 10-11. See First and Second Email from May 15, 2018, ECF No. 47-8 and 47-9, respectively. In pertinent, Federkiewicz replied: "We are very diligent in compliance when sending or receiving funds, now usually we do more than is required but we want to be extremely comprehensive in handling funds. I need a copy of the completed sent wire transfer instruction. Preferably scanned. For clearance processing, the Wire needs to come with 2 items. First is a complete "Laundry Ticket". Sending bank to confirm the

"funds" are: Good, clean, cleared funds legally earned or acquired of non criminal origin. Secondly, the Sending bank should confirm they have known the Client for x years, and this scale of transaction is reasonable within the context of normal course business operation.... This will facilitate FINTRAC documentation (Canada's version of the Patriot Act) and process clearance." PSF ¶ 12. See May 15, 2018 email at ECF No. 47-10.

On May 18, 2018, MEDI wired the $1,375,000.00 dollar deposit to a U.S. bank account belonging to Federkiewicz. PSF ¶ 3. All parties agreed to do it this way because MEDI's financial institution could not wire funds directly to a Canadian bank, thus needing a corresponding stateside bank to proceed with the transfer. See Hernández' Affidavit, page 2; Transaction Receipts, ECF No. 47-12 and 47-13.

On July 29, 2018, Federkiewicz emailed Hernández proposing a new alternative to finance and close the loan in favor of MEDI: "I would like to see if you are available at 11:30 EST on Monday for a conference call with Tom, Gord and myself. I have worked with them this week about the option we discussed last week and they have completed the Facilitation Agreement and the option that I think nicely fits the objectives going forward." PSF ¶ 13. See July 29, 2018 email, ECF No. 47-16. On July 31, 2018, Federkiewicz clarified the new financing structure and stated in part: "[a]s I noted on the call I believe that this Structured Finance Program fits MEDI's requirement almost perfectly...". PSF ¶ 14. See First July 31, 2018 email, ECF No. 47-14.[5] That day, Hernández denied the new alternative: "MEDI is

---

[5] In his July 31st email, Federkiewicz stated the following about the new financing structure:

"[I]t provides the required funds plus a contingency under MEDI's control, it also provides these funds under a Non-Recourse Loan parameters. This allows MEDI the flexibility to experiment with their first installation without the burden of collateral issuance to the lender. Under this scenario 12 Peers is able to provide the funding facility to MEDI as well as take on the obligation to repay the loan when required. The other benefit is that MEDI has a seat at the table for future larger funding request and the same structure can be used to fund future

reluctant to follow this route… So my instructions are to stick to the LOI process." PSF ¶ 15. See Second July 31, 2018 email, ECF No. 47-17. On August 2, 2018, Federkiewicz responded: "Thanks for the note back, we will continue with our existing funding arrangement, I have a draft in front of my group that will be funding and will have the timing out to you once I receive comments back." PSF ¶ 16. See August 2, 2018 email, ECF No. 47-18.

On September 5, 2018, Hernández emailed Federkiewicz and, *inter alia*, mentioned that MEDI was aware it could request the deposit if the loan did not close in 120 days from the LOI's execution. Hernández also stated that "execution" might mean the day the LOI was signed but also the date MEDI wired the funds, and that since the wiring occurred on May 18th, the 120-day term would run until September 16, 2018. PSF ¶ 17. See September 5 email, ECF No. 47-19. On September 11, 2018, Hernández emailed Mr. Federkiewicz again, this time asking Counterclaimants whether the loan was to be closed by Monday, September 17, 2018. PSF ¶ 18. On September 13, 2018, Hernández again emailed Federkiewicz stating: "MEDI has instructed me to terminate the transaction and request that its $1,375,000 deposit be returned tomorrow." Response to PSF ¶ 2, ECF No. 54, page 2. See September 13 email, ECF No. 54-2. On September 17, 2018, 121 days after it had wired the funds to

---

projects without delay or intermediaries.

I will continue to be front and center and a partner with MEDI going forward, I will also continue to work closely with 12Peers on the implementation of the program on MEDI's behalf to ensure the financing component of the project runs smoothly.

As we mentioned time is of the essence, we have the existing MEDI deposit available to be utilized if MEDI would like to move forward with 12Peers, all would need is instructions from MEDI to release the funds on their behalf to MEDI's interest in 12Peers to allow the transaction to commence. If the transaction was to commence either later this week or early next week then the schedule would suggest that by the end of August the funding would be in place."

See First July 31, 2018 email, ECF No. 47-14.

defendants, MEDI sent a formal termination letter, via email from Hernández to Federkiewicz stating that "pursuant to the terms of the Letter of Intent" and requested the return of the deposit.[6] PSF ¶ 19. <u>See</u> September 17, 2018 email, ECF No. 47-22.

## Additional Facts

Riera states that there was never any conversation about a consulting agreement between MEDI and Federkiewicz and that at all times he acted per the LOI. PSF ¶ 20. ECF No. 47-23. Hernández states that Federkiewicz never told him that he was acting as a consultant and not under the LOI. PSF ¶ 21. ECF No. 47-11.[7] Counterclaimants forwarded part of MEDI's deposit to a company named 12 Peers Management ("12 Peers") on May 29, 2018. PSF ¶ 23. ECF No. 47-24 and up to 47-26. Counterclaimants contend to have paid 12 Peers $750,000 as deposit fee for the issue of the HSBC Standby Letter of Credit as per Facilitation Agreement. PSF ¶ 24. ECF No. 47-24 – 47-26. Counterclaimants contend to have spent $750,000 in a payment to 12 Peers as a Retainer 5% of $15M Loan. PSF ¶ 25. ECF No. 47-24 – 47-26. Counterclaimants allege to have no ownership, employment or management relationship with 12 Peers, and no control or access to its documents. Statement of Additional Facts by Counterclaimants ¶ 14, ECF No. 54, page 12.

---

[6] Counterclaimants denied and responded to PSF ¶ 2 by alleging the following: "in the email [...] dated September 13, 2010 [sic], MEDI through Jose Hernández Mayoral ("Hernández Mayoral") prematurely terminated the LOI and requested its deposit back. (<u>See</u> MEDI SJ Ex. X). In addition, MEDI effectively breached and prematurely, wrongfully and constructively terminated the LOI long before that by failing to reasonably cooperate with Defendants in sincere, good faith efforts to obtain a loan." ECF No. 54, page 2-3.

[7] Counterclaimants admitted PSFs ¶¶ 20 and 21 in part but disputed and denied "that Riera or MEDI proceeded at "all times, pursuant to the LOI." The LOI expired before the deposit was made, and this is just general, self-serving *post hoc* statement by Riera." Furthermore, they alleged that they "never waived the deadline nor subsequently agreed that the parties were still proceeding under the LOI." Counterclaimants' Responses to PSFs ¶¶ 20 and 21, respectively.

# IV.   DISCUSSION

## A. The Economic Loss Rule

Before proceeding to analyze MEDI's two principal claims, the court notes that in their response Counterclaimants invoked the Economic Loss Rule (the "Rule") to argue that Plaintiff's tortious claim—grounded on embezzlement—is barred. Counterclaimants specifically relied on Isla Nena Air Servs. v. Cessna Aircraft Co., 449 F.3d 85, 90 (1st Cir. 2006) to compel this court to expand the applicability of the Rule. They are incorrect.

In Isla Nena, the First Circuit Court recognized that the Rule is "peculiar to the law of products liability and applies only where a defective product harms itself". Isla Nena, 449 F.3d at 90. Furthermore, that under the Rule "a party generally may not recover in tort when a defective product harms only the product itself (instead of a person or other property)." Id. at 87 (citing among others East River, 476 U.S. at 867-68; Lockheed Martin Corp. v. RFI Supply, Inc., 440 F.3d 549, 552-53 (1st Cir.2006). In addition, in order to apply the Rule to a case involving a manufacturer's commercial relationship with the affected plaintiff, the Court in Isla Nena relied on another decision, Betancourt v. W.D. Schock Corp., 907 F.2d 1251 (1st Cir.1990). Such decision held that a plaintiff could not assert a tort claim because "Puerto Rico's negligence statute, [31 P.R. Laws Ann § 5141], does not apply in the context of a commercial transaction." Id. at 1255. Furthermore, that "[e]ven when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss ... is essentially the failure of the purchaser to receive the benefit of its bargain...." Id.

From the findings of facts it follows that this case is in no way like Isla Nena or Betancourt. As such, the court concludes that the Rule, invoked by Counterclaimants, is inapplicable in whole. In this case, a tortious claim for the apparent embezzlement of a loan

deposit is brought forth against a lending company who contracted with a municipal corporation. Hence, MEDI's tortious claim has nothing to do with product liability or a commercial transaction in the way provided by <u>Isla Nena</u> or <u>Betancourt</u>. In fact, even if the Rule has been modified by other courts, Counterclaimants not only fail to cite decisions that closely resemble our case but also fail to identify a single *binding* instance in which the Rule was applied to bar tortious claims that stem from embezzlement or any related conduct.[8]

This conclusion, however, in no way limits the forthcoming result of this Opinion and Order, which ultimately—and for other reasons—**DENIES** MEDI's tortious liability claim but **GRANTS** the breach of contract and specific performance claim invoked.

## B. Embezzlement as a Tort

The first of two principal claims brought forth by MEDI relates to embezzlement as a source of extracontractual obligations under Article 1802 of Puerto Rico's Civil Code, <u>31 P.R. LAWS ANN. § 5141</u> ("Article 1802"). In short, MEDI suggests that, because Counterclaimants have "refused to return the deposit and have provided contradictory information as to what [they] did with the money", then this court must apply a presumption against them and conclude that the deposit was embezzled, thus causing tortious harm. ECF No. 47, pages 10-11. This is erroneous because, as reflected (1) MEDI has not placed the court

---

[8] Instead, Counterclaimants partly and incorrectly cite several conversion claim decisions—as if they were binding when they are not: <u>ACI Worldwide Corp. v. KeyBank National Association</u>, 2018 WL 3321566 (D. Mass. June 15, 2018) (which is really a Report and Recommendation from a Magistrate Judge in Massachusetts); <u>Condominium Services, Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.</u> 281 Va. 561 (Va. Sup. Ct. 2011) (which is in no way related to the Rule); <u>Legacy Data Access, Inc. v. Cardillion, LLC,</u> 889 F.3d. 158, 166-169 (4th Cir.2018) (applying North Carolina's Economic Loss Rule to a conversion claim). They also cite <u>Simonet v. SmithKline Beecham Corp.</u>, 506 F.Supp.2d 77 (2007), <u>Sebago, Inc. v. Beazar East, Inc.</u>, 18 F.Supp.2d 70 (1998), <u>Lockheed Martin Corp. v. RFI Supply, Inc.</u>, 440 F.3d 549 (2006), all of which either opt to not apply the Rule or if they do so, it is again as part of a product liability case.

The court does not take lightly Counterclaimants' omission to mention the fact that the Rule in Puerto Rico is limited to product liability cases. In their response, Counterclaimants suggested that the above cases were perfectly applicable to our situation. This sort of argumentative tactic can mislead and induce the court to error. Counterclaimants' counsel should be competent and truthful in their argumentative writing always.

in a position to conclude that a tortious obligation exists between the parties, let alone that embezzlement occurred and caused harm to the Plaintiff; and (2) MEDI's claims arise entirely from the parties' contractual relationship.[9] This is true even when the court applies Puerto Rico's Rule 303(5) of Evidence, which establishes a presumption against the party objecting to the turning of discoverable evidence. <u>P.R. LAWS. ANN. Tit. 32 Ap. VI, R. 303(5)</u>.

Article 1802 provides that "any person or entity who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done...." <u>31 P.R. LAWS ANN. § 5141</u>. A plaintiff who seeks such relief must establish "(1) a negligent act or omission, (2) damages, and (3) a causal relationship between them." <u>Rivera Santiago v. U.S.</u>, No. 08–1266, 2009 WL 702235 at *2 (D.P.R. March 11, 2009); see also <u>Soc. Gananciales v. Padin Co., Inc.</u>, 117 D.P.R. 94 (1986) (*stating* that Article 1802 requires: "[...] 1) the act or omission violating the contract or resulting in the illegal noncontractual act 2) the illegal nature of the same 3) the fault of the agent 4) the occurrence of an injury and 5) the cause and effect relation between the act or omission and the damage."). Article 1802's negligence applies in cases where the party causing the injury had no prior obligation or duty to the party suffering the injury. <u>Nieves Domenech v. Dymax Corp.</u>, 952 F.Supp. 57 (D.P.R.1996)). Furthermore, one can incur in Article 1802 responsibility by committing an illegal act. See <u>Sociedad de Gananciales v El Vocero</u>, 135 D.P.R. 122 (1994); <u>Dávila v. Meléndez</u>, 187 D.P.R. 750 (2013).

---

[9] This goes without saying that the court is in no position to entertain whether embezzlement, as defined by either Federal Criminal norms or Puerto Rico Criminal norms, occurred. This case is one of civil nature in full and despite <u>P.R. LAWS ANN. Tit. 7, § 1080</u> codifying embezzlement as a crime for private money lending companies, the evidentiary standard needed to prove a criminal cause would be "beyond a reasonable doubt", which is stricter than the more flexible "preponderance of evidence" required here. Moreover, the court notes that embezzlement generally requires for proof of illegal appropriation of entrusted money, intentionally used or disposed for a finality not authorized. <u>See</u>, for example, <u>P.R. LAWS ANN. Tit. 33 § 4895</u>; <u>Pueblo de P.R. v. Tapia</u>, 101 D.P.R. 423 (1973); <u>18 U.S.C. § 666(a)(1)(A)</u>.

MEDI moves us to utilize Federal Rule of Evidence 302, which states that "[i]n a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision", in conjunction with Puerto Rico's Rule 303(5), to conclude that Counterclaimants embezzled its money. Fed. R. Evid. Rule 302, 28 U.S.C.A. Nonetheless, while the record shows that Counterclaimants failed to produce certain bank statements, the discovery of these alone would not move the court to logically infer that the deposit was used for a different purpose than the one permitted under the LOI: as equity for the project.[10] Moreover, even with Puerto Rico's Rule 303(5) of Evidence, the missing bank statements alone—which belong to 12 Peers—would not logically lead us to grant an embezzlement cause under the circumstances herein presented.

This conclusion is grounded on the fact that from the record stems evidence to deny the inference that the money was used for something else than the financing of this project. Civil presumptions allow for a judge to infer a given fact that would logically follow from a basic and already proven fact. Diaz v. Wyndham Hotel Corp., 155 D.P.R. 364 (2001); See Fed. R. Evid. Rule 301, 28 U.S.C.A. However, a presumption such as the one established by Puerto Rico's Rule 303(5) of Evidence is not proof of an inferred fact in itself, rather, it inverts the weight of the evidence to the affected party, who would need to present evidence denying the occurrence of the inferred fact. Diaz, 155 D.P.R. at 385-386. While it is true that Counterclaimants did not produce all the account records requested as to 12 Peers, who is a third party to this case, they did present one statement and receipt reflecting that the

---

[10] The court acknowledges that MEDI filed an Urgent Motion to Compel Production of Documents in ECF No. 52, which was later granted in ECF No. 66. The current status of such production is unknown. The last occurrence on the matter was the court's Order in ECF No. 66. Nonetheless, for the purpose of this Opinion and Order, the court clarifies that the result would be the same no matter whether the bank statements were to be produced or not.

$1,375,000 wired to them was initially deposited in a Canadian bank account and later withdrawn and payed to 12 Peers. ECF No. 47-24. This refutes MEDI's argument as to the fact that KLPL failed to deposit the funds in a segregated account. Similarly, KLPL provided an invoice from 12 Peers for a deposit fee for a $15,000,000 standby letter of credit, supposedly related to the MEDI project, and a table identifying an expense as "12 Peers Finance Retainer 5% of $15M Loan - $750,000.00". ECF No. 47-25 and 47-27. This refutes MEDI's argument on KLPL not using the money as equity for the project. Hence, we are in no position to conclude that an illegal act such as embezzlement occurred.

Most importantly however, the court notes that MEDI's main arguments in favor of this court granting MEDI's tort claim are all really based on the breach of the LOI's terms, which would led us to grant the contractual claim of this suit, not so the tortious. First, MEDI argues that Counterclaimants: "did not deposit the funds in a segregated account as agreed to in the LOI". Second, that "[t]he LOI does not allow the use of MEDI'S deposit for a standby letter of credit" and [i]t specifically states that the funds will be used solely to pay for the energy generators." Third, that the payment to 12 Peers "would [...] have been made in violation of the use of funds permitted under the LOI." The court finds that each of these contentions are not issues of tortious or extracontractual nature, rather, they stem from a preexisting agreement between the parties and relate strictly to whether Counterclaimants upheld such terms. Specifically, whether Counterclaimants deposited or disposed of the funds as agreed to with MEDI—for the buying of generators—are matters related to the LOI's compliance. Furthermore, whether the failure to close the loan was due to MEDI's fault, or whether the deposit needed to be returned, are also issues of contractual performance.

Thus, the court not only lacks position to conclude that embezzlement or any other deceitful act occurred here, but also lacks sufficient evidence as to conclude that the harm done to MEDI—not returning the deposit money upon failure to close the loan—is a matter of negligence, fault or any other tortious precept, rather than contractual performance. Plus, nothing in the record reflects that KLPL illicitly caused harm to MEDI *without the existence of a prior civil/contractual obligation between the parties.*

Alternatively, even if we were to be wrong as to the above, our net result would hold true because under Puerto Rico Law, a plaintiff is barred from recovering simultaneously from both a tortious action and a contractual action, when these two arise from the same conduct. Ramos Lozada v. Orientalist Rattan, 130 D.P.R. 712, 728 (1992). In fact, Puerto Rico jurisprudence has concluded that "when the damage suffered exclusively arises as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract", *a party may not choose whether to proceed in a contract or tort*. Isla Nena, 449 F.3d at 90 (*citing* id.). This means that even if we were wrong in determining that there is no meritorious tort claim, MEDI would only be able to recover damages under one of the two causes of actions (the contractual or the tortious), since it was KLPL's same conduct what led to the breach of contract and the tortious harm.

Hence, because the record reflects this to be a matter of contractual performance, MEDI's tortious claim as to the embezzlement of the deposit is **DISMISSED** with prejudice.

### C. Breach of Contract and Lack of Specific Performance

"Under Puerto Rico law, the elements of a cause of action for breach of contract are 1) a valid contract and 2) a breach by one of the parties to the contract." Westernbank Puerto Rico v. Kachkar, Civil No. 07-1606, 2009 WL 6337949, at *36 (D.P.R.2009) (*citing* Torres

v. Bella Vista Hosp., Inc., 523 F.Supp.2d 123, 152 (D.P.R.2007)). "Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." P.R. STAT. ANN. Tit. 31 § 2994. Indeed, "[c]ontracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist." P.R. STAT. ANN. Tit. 31 § 3451. "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. STAT. ANN. tit. 31, § 3471; see Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st Cir.1994). When in a bilateral contract one of the parties fails to comply with what was agreed to, the affected party has the right to choose between demanding the "specific performance" of the contract or the "resolution" of the obligation, in addition to seeking damages and the payment of interests in both cases. 31 P.R. LAWS ANN. § 3052. See also Garcia v. World Wide Entmt. Co., 132 D.P.R. 378 (1992) (a court is barred from ordering specific performance when the agreement requires personal services).

In its Motion for Summary Judgment, MEDI essentially claims that KLPL and Federkiewicz, via the LOI, acquired an obligation that is not related to personal services; thus, that they would be subject to an order from this court for specific performance in case of breach of contract. Moreover, that since KLPL and Federkiewicz have refused to return the deposit—arguing that the LOI is invalid and that Federkiewicz' relationship with MEDI is one of professional services—this court should order them to comply with the LOI's condition to return the deposit if no loan was closed 120 days after its acceptance.

In response, KLPL argues that certain issues of fact prevent this court from issuing summary judgment: (1) "whether [KLPL] knowingly and intentionally made a clear and unambiguous waiver of the expiration date and acceptance and payment deadline in the LOI"; (2) "whether MEDI is liable for fraud in the inducement, fraud in the performance, or breach of contract"; (3) "whether MEDI breached the implied duty of good faith in the negotiation and performance of the LOI" by not disclosing that Hernández was a broker or sales agent EcoGen, or that MEDI had no unmortgaged collateral, and never sending any information on income, revenues, or unencumbered collateral, "thus preventing and interfering with Defendants' attempts to obtain and finalize a loan".

After careful review of the record provided, this court disagrees with KLPL and agrees with MEDI in all but for the fact that the LOI was signed by Federkiewicz in his individual capacity. The evidence presented, at the very least, reflects that: (1) there exists a valid LOI between MEDI and KLPL (ECF No. 47-1); (2) the LOI stated that its terms were to be "accepted" from the moment the parties signed the letter and the initial deposit was wired to KLPL (ECF No. 47-1, page 2); (3) the deposit was transferred and accepted by Federkiewicz—as a representative for KLPL—on May 18, 2018 (ECF No. 47-12 and 47-13); (4) such transfer, as described in the transaction receipt, was intended for the purchase of EcoGen JouleBox units as detailed in the LOI" (ECF No. 47-13); (5) during the following 120 days both parties incurred in further negotiations and efforts to obtain and close the loan, but the loan was not closed before the 120 days deadline (ECF No. 54-1); (6) reason for which MEDI, on September 17, 2018, correctly exercised the clause in the LOI which stated that "if the loan does not close within 120 days from the LOI execution, then the transaction may be terminated by either party and the full deposit will be returned to MEDI" (ECF No. 47-21);

(7) to this day, KLPL has not returned the deposit; and (8) Federkiewicz was never hired as a professional consultant by MEDI (ECF No. 47-11, page 3 and ECF No. 47-23, page 2).

The court will first explain why no consulting services agreement between the Federkiewicz and MEDI exists. The communications exchanged after the acceptance of the LOI evidence that every step of the process was done pursuant to the LOI. Numerous times during the conversations did MEDI, via Hernández, reminded Federkiewicz of the "LOI process" in place. See, for example, ECF No. 47-17. In addition, the deposit receipts reiterated that MEDI was wiring the money "pursuant to the LOI" (ECF No. 47-12 and 47-13), and even close to the 120-day mark MEDI kept reminding KLPL that the LOI stated for the return of the deposit upon failure to close the loan. ECF No. 47-19 – 47-20. Furthermore, KLPL never responded or clarified that the LOI was invalid or that the negotiations were happening under a professional services agreement. In fact, KLPL continued to play along as if the LOI was present. When KLPL suggested an alternate financing route to the one originally discussed upon the signing of the LOI, MEDI explicitly denied such route and asked KLPL to continue the initial LOI process. ECF No. 47-17. This was accepted by KLPL, who responded that they would "continue with our existing funding agreement". ECF No. 47-18. It is therefore unreasonable for this court to conclude that MEDI intended to enter an implied professional services agreement with Federkiewicz for the search of a loan.[11]

Similarly, KLPL further argues that since the deposit was made after the expiration date set in the LOI, then the agreement was invalid right from the start. This is also incorrect.

---

[11] To form a valid contract, whether implied, verbal or written, the Puerto Rico Civil Code requires: (1) consent of the contracting parties; (2) a definite object which may be the subject of contract; and (3) cause for the obligation that is being established. See Burk v. Paulen, 100 F. Supp. 3d 126, 133 (D.P.R. 2015); P.R. LAWS ANN. tit. 31, § 3391. The record in no way reflects the satisfaction of these elements as to a professional services contract between MEDI and Federkiewicz.

While it is true that the deposit was a condition for the acceptance of the LOI, and that such deposit was due before May 4, 2018, KLPL ignores the fact that there was clear communication between both parties in favor of doing business pursuant to the "acceptance" terms *even if the deposit was made at a later date*. In fact, from the parties' conduct it is evident that KLPL *knowingly and voluntarily* accepted the deposit and proceeded according to the LOI's terms even when the transfer was made after the original due date of May 4, 2018.[12] Therefore, it would be incorrect for KLPL to now argue that it did not waive the acceptance deadline when its entire conduct surrounding the LOI stands contrary, or that it did not know of these circumstances and acted involuntarily. Note that the record even demonstrates that between May 4, 2018 and May 18, 2018, the parties exchanged at least eight emails in which KLPL *accepted and recognized* that the deposit was to be transferred in or around May 18, 2018, per the LOI. ECF No. 47-2 – 47-7; ECF No. 47-10.

In addition, KLPL proposes that even if the LOI is valid, it was prematurely ended by MEDI because they asked for its termination and the return of the deposit on September 13, 2019, four days before the 120 days expired. The record demonstrates that KLPL was prospectively informed of MEDI's intent to exercise the termination clause after—not before—the 120-day period. MEDI specifically mentioned this in an email dated September 5, 2018. ECF No. 47-19. Furthermore, on September 11, 2018, MEDI reiterated this and asked KLPL "point blank if the loan would close by Monday, September 17, 2018", ECF No. 47-20.[13] KLPL did not respond. As a result, on September 13, 2018, MEDI requested the

---

[12] For example, on May 13, 2018, Federkiewicz replied: "I am hopeful that we are getting closer, as we have allocated $15M to MEDI we are hopeful that we can get the deposit step completed so we can start the work for us to initiate the project and get the capital moving as soon as possible." PSF ¶ 9. See ECF No. 47-7.

[13] In the same email, MEDI, via Hernández, wrote that it was "entitled to have the funds returned after 120 days of execution if the loan does not close. As I mentioned last week, the LOI was signed on May 1st and the funds transferred on May 18th. If the "date of execution" is the date it was signed, the 120 days already

return of deposit by September 14, 2018. ECF No. 54-2. MEDI followed up and sent a formal "termination letter" on September 17, 2018, past the 120-days. ECF No. 47-22. Hence, MEDI was not trying to terminate the LOI prematurely and indeed did not do so. Under these circumstances, an email sent three days before that deadline date does not compel this court to rule in favor of KLPL's argument and, in fact, simply shows MEDI's good faith.

Furthermore, the court finds that KLPL is incorrect in arguing that there are material facts in dispute as to whether MEDI acted in good faith, or if it behaved fraudulently. The record reflects that Hernández disclosed, (1) as early as May 5, 2018, that "he was coming in as EcoGen's rep" but that MEDI had authorized him to talk on its behalf (see First May 5 Email at ECF No. 47-4)[14], and (2) that MEDI could provide the San Antonio Hospital as collateral to guarantee the initial disbursement.[15] ECF No. 47-19 and ECF No. 54-3, pages 24 and 37. Furthermore, that despite the hospital having a lien, this did not pose a problem because "whatever needed to be done regarding that [could] be done rapidly". ECF No. 47-19. Moreover, upon requiring additional information on income and collateral, Riera provided appraisals for other available properties. ECF No. 54-4, pages 44-46. Even if such

---

elapsed. If we measure it from the date the funds were wired, the 120 days will come up this Sunday, September 16. But if we know today the loan will not close by Monday, September 17, there is no point in waiting until then. [...] If you do think this can close by next Monday you need to put me in a position to persuade Alejandro to wait until then." ECF No. 47-20.

[14] That same day, Federkiewicz responded: "[t]hanks for providing the detailed framework you are working under. It seems like Alejandro [Executive Director for MEDI] and you have a real good idea on how to move things forward...". PSF ¶ 6. See Second May 5, 2018 email at ECF No. 47-4.

[15] In his 2020 affidavit (ECF No. 54-1, ¶¶ 11-12), Federkiewicz swore (1) that he learned for the "first time that Hernández had no formal role or relationship with MEDI" when he read the deposition transcript, and (2) that Hernández "always represented himself to Know Limits and me as an agent or representative of MEDI". Nonetheless, the evidence demonstrates the contrary. In an email sent in 2018 and answered by Federkiewicz himself it is clearly stated that Hernández "was coming in as EcoGen's rep" and that Riera had allowed him to speak on behalf of MEDI. The court will not tolerate such gross factual discrepancy to go unrecognized. Instead, we warn Federkiewicz to be careful not to include dubious assertions as part of any future affidavit. Severe discrepancies, again, could induce the court into error, which is a very serious matter.

information did not satisfy KLPL, it reflects good faith by MEDI and sheds doubt on why KLPL failed to draft an initial version of the loan agreement, as petitioned by MEDI.

Finally, note that nothing in the record points toward the fact that Federkiewicz signed the letter in his individual capacity or that MEDI was under such impression during the negotiations. The terms of the LOI are clear enough, labeling Trevor Federkiewicz' signature as "President / CEO – Known Limits Private Lending Inc. Authorized Agent". ECF No. 47-1, page 3. Furthermore, from the communications between the parties (ECF No. 47-3 – 47-10, and 47-18 – 47-20), the answers to MEDI's interrogatories (ECF No. 47-2), and Federkiewicz' affidavit (ECF No. 54-1), there seems to be no doubt as to his role in the negotiations as a speaker and agent for KLPL. The fact that the initial deposit had to be transferred to a stateside account belonging to Federkiewicz—because MEDI's financial institution could not wire to Canada directly—is not enough to prove otherwise.

For the above reasons, MEDI's cause of action as to specific performance of the LOI is **GRANTED** against KLPL, not so against Federkiewicz individually.

### D. Dismissal of KLPL's and Federkiewicz' Counter Claim

The Court's decision to grant MEDI's Motion for Summary judgment as to the specific performance claim also requires the dismissal of Counterclaimants' counter claim.

First, as to unjust enrichment: "[t]o prove unjust enrichment, the following must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment' (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause." Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014). "The doctrine of unjust enrichment does not apply where

there is a contract that governs the dispute at issue." Id. Hence, in our case, Counterclaimants cannot invoke such doctrine as there is a contractual obligation in place.

Similarly, since KLPL failed to close the loan for reasons unrelated to MEDI's part in the negotiation, its own claims for all kinds of fraud and breach of contract against MEDI should be dismissed as well. Note that, from the evidence provided and the findings of fact, the court found that MEDI acted in good faith and that it was KLPL who breached the agreement. This is inconsistent with the remedy pursued by KLPL and Federkiewicz in their counterclaim. Moreover, for the same reasons discussed in Part C, the court cannot entertain Counterclaimants' arguments as to MEDI's alleged fraud or misrepresentation.[16] In fact, even if the aforementioned were to be wrong, the court doubts that failure to disclose certain information on income, collateral, or the role of Hernández as a representative for EcoGen would have *gravely*—rather than *incidentally*—affected the chances to obtain and close the loan, or the interest of KLPL to become part of the deal. Nothing in the record reflects so.[17]

To boot, note that the LOI did not require for the specific information disclosure conditions—proof of collateral, appraisals, and availability of revenue—later imposed upon MEDI. KLPL furthermore could have handed a draft of the loan agreement as solicited by MEDI but instead bypassed such request even when MEDI communicated it needed to know "why it has not seen a draft of the loan agreement" [...] and that "a draft can be prepared

---

[16] In Puerto Rico, "fraud that affects a contracting party is commonly referred to as "dolo" or deceit." Burk v. Paulen, 100 F. Supp. 3d 126, 134 (D.P.R. 2015); Fournier v. Eastern Airlines, Inc., 655 F. Supp. 1037, 1038–39 (D.P.R.1987). To prove dolo, generally, Plaintiff must establish: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." Burk, 100 F. Supp. 3d at 134 (*citing* Portugues–Santana, 657 F.3d at 62). Here, the evidentiary record presented fails to satisfy most if not all these elements.

[17] Dolo is " 'substantial' " ("grave"), when it determines the consent of a party, or "incidental" when it merely influences the consent." Burk, 100 F. Supp. 3d at 134; P.R. LAWS ANN. tit. 31, § 3409.

with the caveat that matters regarding collateral are pending". ECF No. 47-19. As such, the only breach of contract and bad faith herein found is that of KLPL.

KLPL's and Federkiewicz' counter claim is **DISMISSED WITH PREJUDICE.**

## V.    CONCLUSION

For the reasons above, this court hereby **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Summary Judgment (ECF No. 47). Accordingly, MEDI's claim for embezzlement is **DENIED** with prejudice, while its specific performance and breach of contract claim is **GRANTED** as to KLPL only. For the same reasons, KLPL's and Federkiewicz' counterclaim (ECF No. 14) is hereby **DISMISSED WITH PREJUDICE**. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, November 16, 2020.

<u>**S/ JUAN M. PÉREZ-GIMÉNEZ**</u>
JUAN M. PÉREZ-GIMÉNEZ
SENIOR U.S. DISTRICT JUDGE